IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No.  07-cv-02237-WYD-KLM

ESTATE OF TIMOTHY GLENN MATHIS, by Dee Babb. and Genese Mathis as
Personal Representatives;
DEE BABB, as Parent and Personal Representative;
ANGELINA A. MATHIS, as the Daughter of Timothy Glenn Mathis,

       Plaintiffs,

v.

KEVIN KINGSTON;
CHRIS GILLILAND;
BILL NESTLERODE;
JAMES ALDERDEN;
JOHN DOE DEPUTY SHERIFFS 1-10, each in his or her individual and official
capacity; and
THE LARIMER COUNTY BOARD OF COMMISSIONERS,

       Defendants.

---

## ORDER

---

I.    <u>INTRODUCTION</u>

      THIS MATTER is before the Court on Defendants' Motion for Summary

Judgment, filed October 22, 2008 [#39].  Plaintiffs filed a Response to the Motion for

Summary Judgment on November 25, 2008 [#64], and Defendants filed a Reply on

December 10, 2008 [#68].  For the reasons set forth herein, the Motion for Summary

Judgment is **DENIED**.

II.    <u>BACKGROUND</u>

      This case involves allegations of excessive force against three Larimer County

Sheriff's Office Deputies, Deputy Kevin Kingston, Deputy Chris Gilliland, and Deputy Bill Nestlerode (collectively the "Deputies"), and allegations of failure to train against Larimer County Sheriff James Alderden and the Larimer County Board of Commissioners.

On October 3, 2005, the Deputies were dispatched on a "welfare check" to an area near Loveland, Colorado.  A "welfare check" requests police response to a citizen in need of assistance and is not a request for response to a crime in progress.  Deputy Gilliland and Deputy Nestlerode were on-duty and responded to the call. Deputy Kingston, who was off-duty in plainclothes but traveling in a marked Larimer County Sheriff's Department patrol car, also responded to the call.  Deputy Kingston weighted 240 pounds, and was 6 foot, 3 inches in height.  Deputy Gilliland was 6 foot, two inches in height and weighted 200 pounds.  Deputy Nestlerode was 6 foot in height and weighed 179 pounds.  When the Deputies arrived on the scene, they encountered Timothy Glenn Mathis who was covered in blood and, according to the Deputies, "jumping up and down like a monkey," and "flailing his arms about wildly."  Mr. Mathis appeared highly agitated, and possibly mentally ill or under the influence of methamphetamine or other drugs.  The Deputies encountered Mr. Mathis outside of a mobile home, which had a broken door believed to be the result of Mathis' attempt to enter the mobile home.

Either Deputy Gilliland or Deputy Kingston identified themselves as Deputy Sheriffs.  At this time Deputy Kingston was separated from Mr. Mathis by 30 feet.  Mr. Mathis did not acknowledge the Deputies verbal commands.  At some point, Deputy

Kingston ordered Mr. Mathis to show his hands.  When Mr. Mathis did not comply,

Deputy Kingston called out "TASER, TASER, TASER" and fired his TASER X26 at Mr.

Mathis.   Mr. Mathis, however, was not affected by this taser shot.  According to

Defendants, Deputy Kingston noticed that Mr. Mathis had an object in his hand (later

identified as a five-pound decorative brick) and repeatedly ordered Mr. Mathis to drop

the object.  Plaintiffs maintain that according to Deputy Nestlerode's testimony, Mr.

Mathis obtained the brink at a later point, after he was forced to his knees.  Deputy

Gilliland then fired his TASER X26 at Mr. Mathis and as Mr. Mathis turned and walked

towards Deputy Gilliland, Deputy Kingston fired his a third taser shot at Mr. Mathis,

causing Mr. Mathis to fall to the ground.  Deputy Kingston then performed a "Drive-Stun"

technique by discharging the taser as it was directly pressed to Mr. Mathis' body.

At some point, Mr. Mathis got up off the ground.  Deputy Kingston then directed

Deputy Nestlerode to use his baton on Mr. Mathis and Deputy Nestlerode delivered

several baton strikes to Mr. Mathis.  At this point, all three Deputies were giving

repeated loud verbal commands to Mr. Mathis to get down on the ground, but Mr.

Mathis did not comply.  Deputy Kingston then obtained Deputy Gilliland's baton and

delivered several baton strikes to Mr. Mathis' lower arms in an attempt to get him to

drop the brick, which may have broken Mr. Mathis' arm.  Eventually, Mr. Mathis went

down to his knees and, following another taser shot from Deputy Gilliland, pulled the

brick close to his chest, curled his body over it and stated "You can't have it, its mine,"

and "please help me."  Mr. Mathis then fell or was pushed to the ground.

Deputy Kingston placed his left shin on Mr. Mathis' jaw and attempted to restrain

him, and both Deputy Kingston and Deputy Nestlerode then tried using batons to pry Mathis' arms from underneath him.  While holding Mr. Mathis on the ground, Deputy Kingston noticed that he had become quiet and still and was not breathing.  Deputy Kingston began CPR chest compressions, and Deputy Gilliland retrieved a CPR breathing mask from his patrol car.  The Deputies placed a request for medical help during the struggle and a second call for emergency help.  Mr. Mathis was transported from the scene to the hospital by ambulance, where he remained until his death nearly three weeks later on October 25, 2005.  After autopsy, the death was denoted as "homicide" by the coroner and the cause of death was stated as bilateral acute pneumonia complicating ischemic encephalopathy received after cardiopulmonary arrest during restraint.  The autopsy also confirmed the presence of Methamphetamine, Amphetamine and Temazepam in Mr. Mathis' body.

The Larimer County Sheriff's Office protocol regarding use of tasers and other electronic controlled devices mandates that deputies cease using the taser weapons after three taser shots unless "articulable and justifiable extenuating circumstances" exist.  On June 28, 2005, several months before the incident involving Mr. Mathis, Taser International, Inc. distributed Bulletin 12.0-04 via e-mail to customers of Taser International, Inc.  The document stated in part:

> 2. Repeated, prolonged, and/or continuous exposure(s) to the TASER electrical discharge may cause strong muscle contractions that may impair breathing and respiration, particularly when the probes are placed across the chest or diaphragm.  Users should avoid prolonged, extended, uninterrupted discharge or extensive multiple discharges whenever practicable in order to minimize the potential for overexertion of the subject or potential impairment of full

ability to breathe over a protracted time period.

3. Particularly when dealing with persons showing symptoms of excited delirium, use of the TASER system should be combined with physical restraint techniques to minimize the total duration of the struggle and minimize the total duration of TASER system stimulation. Excited delirium is a potentially fatal condition caused by a complex set of physiological conditions including over-exertion of the subject and inability for sufficient respiration to maintain normal blood chemistry.  These subjects are at significant and potentially fatal health risks from further prolonged exertion and/or impaired breathing.

Plaintiffs contend that the actions of the Deputies were excessive, unnecessary and constitute an objectively unreasonable use of force, in violation of Mr. Mathis' rights under the Fourth Amendment to the Constitution of the United States.  In addition, Plaintiffs assert that Defendants Sheriff James Alderden and the Larimer County Board of Commissioners had a policy and practice of not training sheriff's deputies adequately with respect to dealing with individuals demonstrating mental illness and the effects of narcotic intoxication, the state of "excited delirium," and the use of taser weapons under these circumstances.  Plaintiffs bring these claims on behalf of themselves and as Personal Representatives of the Estate of Timothy J. Mathis, and seek relief pursuant to 42 U.S.C. § 1983.

III.   ANALYSIS

A.   Summary Judgment Standard

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c).

The burden of showing that no genuine issue of material fact exists is borne by the moving party. *E.E.O.C. v. Horizon/ MS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter. *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead bring forward "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In reviewing a summary judgment motion, the court must view the evidence in the light most favorable to the nonmoving party. *Anaya v. Crossroads Managed Care Systems, Inc.*, 195 F.3d 584, 590 (10th Cir. 1999). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

B.   Excessive Force Claim

In their Motion for Summary Judgment, Defendants contend that the material facts necessary to decide Plaintiffs' excessive force claim are not in dispute, and there is no evidence in the record suggesting that the Deputies' actions were not objectively reasonable in light of the facts and circumstances in this case.[1]

---

[1]I note that while Defendants have preserved qualified immunity as an affirmative defense to Plaintiffs' claims in this case, they do no raise the issue of qualified immunity in their Motion for Summary Judgment. Defendants have framed the issue in their Motion for Summary Judgment as whether sufficient evidence exists in the record to establish that "the Deputies actions were not objectively reasonable." Mtn. Sum. J. at 7.

The Fourth Amendment forbids unreasonable seizures, including the use of excessive force in making an arrest. *Casey v. City of Federal Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotations omitted); *Casey*, 509 F.3d at 1281. While the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," the ultimate question is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 396-97. This determination "requires careful attention to the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "The court must look to the 'reasonableness' of the use of force, judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "As in other Fourth Amendment contexts, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

In connection with the Motion for Summary Judgment, Defendants submit two

expert reports concerning the reasonableness of the Deputies' conduct.  The first report

is from Dan Montgomery, a retired police chief for the City of Westminster, and the

second report is from Kevin Sailor, a Sergeant with the City of Westminster Police

Department and a Senior Master Instructor in the use of tasers.  Both Mr. Montgomery

and Mr. Sailor opine that the Deputies use of force in this situation, under the totality of

the circumstances, was objectively reasonable.  In addition, Defendants assert that the

expert opinion from Plaintiffs' expert witness, Roger L. Willard, is inadmissible under

Federal Rule of Evidence 702 and should be stricken because Mr. Williard's testimony

is based on his erroneous belief that the standard of care in an excessive force case is

"minimal use of force in that only that amount of force necessary may be used."

As an initial matter, and based on the portions of the deposition transcript

provided in connection with the Motion for Summary Judgment, I do not agree with

Defendants' characterization of Mr. Williard's testimony.  While Mr. Williard could not

articulate - word for word - the difference between the standard of care applicable in a

state court tort action, versus the standard applicable in a federal court civil rights

action, he repeatedly stated his opinion that the Deputies' conduct in this case was not

reasonable under the circumstances.  Williard Depo., p. 18, ln. 4-5, 21-24 ("an officer

should not use more force than is reasonable and appropriate").  As to the applicable

standard of care, Mr Williard clearly stated that in his professional opinion "a police

officer may only use that amount of force that is reasonable and appropriate to effect his

objective."  Williard Depo., p. 18, ln. 21-24.  Similarly, in his written opinion, he stated

that "the force employed against Mr. Mathis in this case was neither reasonable nor

-8-

appropriate under the circumstances." Rsp. to Mtn. Sum. J., Exhibit 13. Contrary to Defendants' representations, Mr. Williard did not testify that the Deputies should have used pepper spray instead of a TASER, rather he stated that use of pepper spray was "another option." Williard Depo., p. 28, ln. 16-18.

However, even absent Mr. Williard's deposition testimony, I find that on the record before me, when viewed in the light most favorable to Plaintiffs, material issues of fact remain regarding the objective reasonableness of the Deputies' use of force. Viewing the facts in the light most favorable to Plaintiffs, the Deputies were initially dispatched to the scene under a welfare check, and did not have any information that a crime had been committed. The parties agree that when the Deputies arrived at the scene, Mr. Mathis was engaging in very bizarre behavior. In fact, the Deputies acknowledge that Mr. Mathis did not appear to understand any verbal commands. While the Plaintiffs acknowledge that Mr. Mathis did not respond to the Deputies verbal commands, the evidence when viewed in the light most favorable to Plaintiffs suggests that this lack of compliance was not a "refusal" to comply, but an inability to comply based on Mr. Mathis' diminished capacity. At no point during the confrontation did Mr. Mathis ever strike the Deputies, punch, kick or verbally threatened the Deputies, or make any attempt to flee the scene. While the testimony is disputed regarding when Mr. Mathis obtained the decorative brick, there is no evidence that Mr. Mathis attempted to use the decorative brick in an aggressive manner. When the Deputies tried to take the decorative brick from Mr. Mathis he stated "you can't have it, its mine." In fact, Mr. Mathis did not say anything else during the confrontation other than "please help me."

When viewed in the light most favorable to Plaintiffs', the record suggests that Mr. Mathis' diminished capacity was immediately apparent to the Deputies when they arrived on the scene.  While he was engaged in bizarre behavior, Mr. Mathis did not pose an immediate threat to the safety of the officers or others, nor did he attempt to flee the scene.  There are genuine issues of material fact as to whether use of multiple taser shots followed by Deputy Kingston's use of the "Drive-Stun" technique, multiple baton strikes to Mr. Mathis' arms and legs delivered with enough force to break his arm, followed by an additional taser shot, constitutes a reasonable use of force under these circumstances.

      C.    <u>Failure to Train</u>

Plaintiffs contend that the Board of County Commissioners and Sheriff Alderden are liable for the Deputies' alleged violation of Mr. Mathis' Fourth Amendment rights by inadequately training them in both the proper interaction with the mentally ill or those under the influence of narcotics, and in the appropriate use of tasers.

In order to establish municipal liability for inadequate training on the use of force, Plaintiffs must demonstrate:

> (1) the Deputies exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city towards persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Myers v. Oklahoma County Bd. of County Com'rs*, 151 F.3d 1313, 1318 (10th Cir 1998).

Defendants contend that Plaintiffs' failure to train claim fails as a matter of law, and

assert that there is no evidence in the record to support the first, third and fourth elements of this test.

I have already determined that material issues of fact remain with respect to whether the Deputies' exceeded constitutional limitations on the use of force.  As to the third element, whether the inadequate training demonstrates deliberate indifference, the Supreme Court has held that "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality - a 'policy' . . . can a city be liable for such failure under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  Defendants contend that Larimer County did not have a policy of deliberate indifference, and in support of this assertion, Defendants again rely on the testimony of Mr. Sailor, a certified taser instructor and an employee of the Westminister Police Department, who opines that the use of the taser device in this case was consistent with recognized standards and training.  Defendants also rely on a portion of Mr. Montgomery's report in which he states that the Deputies were adequately trained.

The Larimer County Sheriff's Office began to use taser weapons approximately one year prior to the incident at issue in this case.  It is undisputed that the Deputies received some initial training regarding the use of tasers at that time, but did not receive any additional training until approximately one month after the incident.  It is also undisputed that on June 28, 2005, several months prior to the incident involving Mr. Mathis, Taser International Inc. e-mailed Taser International Bulletin 12.0-04 to its

customers, including the Larimer County Sheriff's Office.[2]  Bulletin 12.0-04 specifically warned that "repeated, prolonged, and/or continuous exposure(s) to the TASER electrical discharge may cause strong muscle contractions that may impair breathing and respiration . . .."  Bulletin 12.0-04 also warned that "when dealing with persons showing symptoms of excited delirium, use of the TASER system should be combined with physical restraint techniques to minimize the total duration of the struggle and minimize the total duration of TASER system stimulation."  The Bulletin further warned that "excited delirium" is a potentially fatal condition.  However, the Deputies all testified that they had never seen Bulletin 12.0-04 until the date of their depositions, and were first aware of the existence the term "excited delirium" when Defendant Sheriff James Alderden mentioned it at a press conference discussing Mathis' death.  The Deputies further testified that they had been made aware of some of the contents of Taser International Bulletin 12.0-04 approximately thirty days after the incident involving Mr. Mathis.  Moreover, at the time of their depositions, the Deputies were not aware that "excited delirium" had symptoms that could be observed by a trained police officer.

 Defendants rely heavily on the reports submitted by Mr. Montgomery and Mr. Sailor.  However, while Mr. Montgomery's report states that the Deputies were certified to use the X26 TASER and "have received ample training in this area by a qualified instructor," it does not comment on whether the Deputies were adequately trained with respect to use of the Taser in dealing with the mentally ill, individuals under the

---

[2]Defendants contend that Plaintiffs cannot establish that the County actually received this Bulletin, but for purposes of resolution of the Motion for Summary Judgment, Defendants admit to receipt of the Bulletin.

influence of narcotics, or individuals in a state of "excited delirium."  *See* Mtn. Sum. J.,
Ex. 4, p. 9.  In addition, Mr. Sailor testified in deposition that he was aware of Bulletin
12.0-04, and has shared the contents of the Bulletin with other members of the
Westminster Police Department.  Mr. Sailor further testified (1) that "excited delirium"
can be objectively observed, (2) that the phenomenon was "common knowledge" in
police departments for the last five years, (3) that he trains officers with the
Westminister Police Department on detecting "excited delirium" and (4) that Mr. Mathis
displayed "almost a textbook case" of excited delirium.  Rsp. to Mtn. Sum. J., Exhibit. 2.
In addition, Plaintiffs' police tactics expert testified that Bulletin 12.0-04 was important
information that should have immediately been disseminated to line Deputies in the
Larimer County Sheriff's Office.  Viewing the evidence in the light most favorable to
Plaintiffs, material issues of fact exist as to whether Defendants' failure to train the
Deputies on the observable phenomenon of "excited delirium," and Defendants' failure
to alert them to the various risks outlined in Bulletin 12.0-04 amounts to deliberate
indifference.

Finally, Defendants contend that there is no evidence to support the fourth
element of Plaintiffs' failure to train claim - whether there is a causal link between the
constitutional deprivation and the inadequate training - because Plaintiffs cannot prove
that use of the taser caused Mr. Mathis' death.  It is undisputed that Mr. Mathis died
following cardiac arrest.  It is also undisputed the autopsy of Mr. Mathis indicates he
tested positive for the presence of Methamphetamine, Amphetamine and Temazepan.
The parties have presented conflicting evidence as whether the taser shots inflicted on

Mr. Mathis contributed to his cardiac arrest.  Plaintiffs' expert, Dr. John Webster, testified in deposition that a combination of several factors were responsible for inducing cardiac arrest - including application of the taser, the Methamphetamine and Mr. Mathis' physical exertion during the altercation.  Thus, according to Dr. Webster, use of the taser was at least one cause of Mr. Mathis' cardiac arrest.  On the other hand, Defendants' expert, Dr. Mark Kroll, states that use of the taser did not contribute in any way to Mr. Mathis' death.  If the jury were to determine that the Deputies exceeded constitutional limits on the use of force, they may then decide whether a link exists between the unconstitutional use of force and Defendants' alleged failure to train the Deputies regarding taser use on individuals exhibiting "excited delirium."  Therefore, summary judgment in inappropriate as to Plaintiffs' failure to train claim.

IV.   CONCLUSION

In conclusion, for the reasons set forth herein, it is hereby

ORDERED that Defendants' Motion for Summary Judgment, filed October 22, 2008 [#39] is **DENIED**.

Dated:  April 16, 2009

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge